**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

_____
CIPHERTRUST, INC.,            )
                             )
            Plaintiff,        )
V.                           )        Civil Action No. 1:04cv1232
                             )
TRUSECURE CORPORATION,        )
BETRUSTED US, INC.            )
AND                          )
BETRUSTED HOLDINGS, INC.,     )
                             )
            Defendants.       )
_____)


      This matter comes before the Court for trial without a jury.
On October 15, 2004, Plaintiff filed a three-count Complaint
against Defendants alleging the following. First, Defendants use of
the CYBERTRUST mark constitutes trademark infringement. 15 U.S.C.
§ 1114(1) (2000). Second, Defendants use of the CYBERTRUST mark
constitutes false designation of origin. 15 U.S.C. § 1125(a).
Third, Defendants' trademarks, Federal Trademark Registration Nos.
2,139,469 and 2,201,764, are invalid and should be removed from the
Principal Register by order of the Court. 15 U.S.C. § 1064.

      On November 8, 2004, Defendants responded by filing a four-
count Counterclaim against Plaintiff alleging the following. First,
the Court should declare Defendants the owners of all right, title,
and interest to Federal Trademark Registration No. 2,669,929, and
the CYBERTRUST mark valid, enforceable, and not abandoned. Second,

the Court should declare Defendants use of the CYBERTRUST mark valid in that it does not infringe on Plaintiff's use of the CIPHERTRUST mark. Third, Plaintiffs use of the CIPHERTRUST mark constitutes trademark infringement and false designation of origin. 15 U.S.C. §§ 1114(1), 1125. Fourth, Plaintiff's trademark, Federal Trademark Registration No. 2,669,929, is invalid and should be removed from the Principal Register by order of the Court. 15 U.S.C. § 1064. The Court has subject matter jurisdiction over Plaintiff's Complaint Defendants' Counterclaim pursuant to 15 U.S.C. § 1121(a), and 28 U.S.C. §§ 1331, 1333. After considering the evidence presented and submissions of the parties, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Plaintiff CipherTrust, Inc. is a Georgia corporation with its principal place of business in Alphraetta, Georgia.

2. Through transactions that closed on November 4, 2004, Defendants effectively merged into a single entity called Cybertrust Holding, Inc. (Cybertrust), with its principal place of business in Herndon, Virginia. Cybertrust announced the merger on September 21, 2004, and continues to carry out the business of the merged companies and offer the same goods and services.

3. Public Key Infrastructure is a method of facilitating secure online communications and transactions through the use of

digital certificates.  Digital Certificates are issued by, or chain back to, trusted root keys that are used to identify users and authenticate transmissions.  Digital certificates are issued by a certificate authority.  For a PKI system to function, the public portion of a root key must be embedded in Internet browsers, web servers, and mobile devices.  Unless a root key is embedded in a user's Internet browser, the browser will not recognize certificates that chain back to that root.

4.  GTE CyberTrust was a division of GTE.  From 1996 to March 2000, GTE CyberTrust sold PKI-related goods and services.  GTE CyberTrust used the CYBERTRUST mark on or in connection with the sale of various PKI-related goods and services, including: (1) root keys (the most popular of which was called the "GTE CyberTrust Root"); (2) CA software (called "CYBERTRUST CA"); (3) the OmniRoot licensing program; and (4) SSL certificates.

5.  Embedment is the process by which root keys are installed in Internet browsers, web servers, and mobile devices so that certificates issued by these roots will be recognized and accepted by a user's computer. Trans. at 367.

6.  SSL certificates are digital certificates installed by websites to assure users that the website is legitimate and secure. They are sold to websites after the issuer validates the identity of the website and confirms its legitimacy. This allows Internet users to engage in online transactions with some assurance of

-3-

privacy.    Websites  indicate  that  they  are  secured  by  an  SSL
certificate  by  displaying  a  small  yellow  padlock  at  the  bottom  of
the  screen.    Double-clicking  on  the  padlock  reveals  the  SSL
certificate securing the website.

7.   VeriSign  was  GTE  CyberTrust's  primary  competitor  with
respect to managed PKI services.

8.   In  1998,  GTE  CyberTrust  applied  for,  and  obtained,  two
federal  registrations  for  the  CYBERTRUST  mark.    On  February  24,
1998,  Cybertrust  received  U.S.  Reg.  No.  2,139,469  (the  '469
Registration)  for  computer  security  encryptian  software.    On
November  3,  1998,  CyberTrust  received  U.S.  Reg.  No.  2,201,764  (the
'764  Registration)  for  on-line  computer  user  certification
services.

9.   In  March  2000,  Baltimore  Technologies  (Baltimore)  acquired
the  CyberTrust  division  from  GTE.    Trans.  at  364.  Baltimore
operated  the  former  GTE  CyberTrust  PKI  business  until  late  2003,
when  it  sold  that  business  to  Betrusted.    Trans  at  362.

10.   Baltimore  considered  the  CYBERTRUST  mark  to  be  a  valuable
asset.    When  Baltimore  created  two  new  roots  of  its  own  in  2001,  it
named  them  BALTIMORE  CYBERTRUST  ROOT  and  BALTIMORE  CYBERTRUST
GLOBAL  ROOT.    Baltimore  continued  to  use  the  CYBERTRUST  mark  in
connection  with  CA  software  because  the  CYBERTRUST  brand  had  earned
consumer  loyalty  and  recognition  in  the  American  market.

11.   Baltimore  and  Betrusted  continued  to  use  the  CYBERTRUST

-4-

mark on or in connection with: (1) the roots themselves; (2) CYBERTRUST CA software; (3) the OmniRoot licensing program; and (4) the online sale of SSL certificates. Specifically, Baltimore continued to embed the CyberTrust Root in Internet web browsers, web servers, and mobile devices between 2000 and 2003. Trans. at 369; DTX 26 at 28, 32, 71 and 105. After it acquired the business from Baltimore, Betrusted continued to embed the CyberTrust Root in Internet browsers, web servers, and mobile devices between 2003 and 2004.

12. To embed the CyberTrust Root in an Internet browser (or elsewhere), Baltimore or Betrusted would negotiate an embedment agreement and then transmit the root as an electronic file. The recipient would open the file to confirm that the root it had received was, in fact, the CyberTrust Root. Third parties (including Microsoft, Sprint, and Apple) commonly reference CYBERTRUST in their marketing or technical literature.

13. Baltimore also continued to support and maintain CYBERTRUST CA software in stand-alone and hosted format. While Baltimore announced an intention to rename future versions of its CA software to BALTIMORE CMS, it continued to use the names CYBERTRUST CA and BALTIMORE CMS interchangeably in documentation. At one time, Baltimore considered renaming one of its business units "Cybertrust." Baltimore sales people never stopped using the Cybertrust name to refer to the Cybertrust CA Software and it

continued to support such versions of the software.

14.   In approximately 2003, Baltimore published a document entitled "Addendum Cybertrust Certificate Authority" to support customers who continued to use older versions of CYBERTRUST CA software in stand-alone and hosted format.

15. OmniRoot was the name of the licensing program that allowed certificate authorities to issue certificates that chained back to the CyberTrust Root.  Baltimore continued to use the CYBERTRUST mark in connection with the promotion and sale of the OmniRoot licensing program.  In September 2001, Baltimore published a document entitled, "Baltimore Omniroot CA Certificate Customer Overview," which states in prominent text that OmniRoot "Leverage[s] the CyberTrust Root."  This is consistent with the manner in which the CYBERTRUST mark was used to promote the OmniRoot licensing program.

16.   Like GTE CyberTrust, Baltimore and Betrusted continued to sell SSL certificates to website owners seeking to secure their sites.  Website owners who purchased SSL certificates from GTE CyberTrust or Baltimore were given the option to place a seal on their websites to communicate to visitors that the site was secure. The seal contained the following language: CYBERTRUST SURE SERVER SITE.  This seal was made available to, and used by, customers through at least mid-2003.  Customers actually installed the

CYBERTRUST SURE SERVER SITE seal on their websites.  Trans. at 421-22; DTX 315.

17.   Neither Baltimore nor Betrusted ever ceased using the CYBERTRUST mark on, or in connection with, the embedment of roots, or in connection with the continued support and maintenance of customers using CYBERTRUST CA version 4.0.

18.   Neither Baltimore nor Betrusted ever ceased using the CYBERTRUST mark in connection with marketing the OmniRoot licensing program, or in connection with the sale of SSL certificates.

19. GTE Cybertrust, Baltimore, and Betrusted all sold SSL certificates to third parties through their corporate websites. Every SSL certificate issued by GTE CyberTrust, Baltimore, and Betrusted chained back to the CyberTrust Root.  Certificates that chain back to the CyberTrust Root indicate this  fact right to their face.

20. By issuing SSL certificates after validating the identity of the websites seeking to obtain the certificate, GTE CyberTrust, Baltimore, and Betrusted were performing certification authority services, i.e., they were performing the service of a certificate authority.  Neither Baltimore nor Betrusted ever ceased issuing SSL certificates that were identified on their face as being issued by the CyberTrust Root.  Because there was no period of non-use, neither Baltimore nor Betrusted abandoned any rights in the

CYBERTRUST mark, including any rights to the services set forth in the '764 Registration.

21.  CipherTrust was founded as an email security company in 2000, and remains an email security company today.  All of the products and services currently offered by CipherTrust relate to email security.  According to CipherTrust's CEO, CipherTrust's "sole mission" is to protect its customers against messaging threats.  The company's current tagline is "The Leader in Messaging Security."  Previous CipherTrust taglines include "Peace of Mind in Messaging," and "Enterprise E-mail Security."

22.  Cybertrust is a managed security services company offering a abroad array of security services.  While Cybertrust is not an email security company, it does compete against email security companies.  While CipherTrust maintains research files on companies with competitive offerings, it did not maintain any such files on Cybertrust (or TruSecure, Betrusted, or Ubizen) until at least five months after commencing this litigation.  There is not a single industry analyst report characterizing CipherTrust and Cybertrust (or TruSecure, Betrusted, or Ubizen) as competitors.

23.  Despite having closed hundreds of deals since September 2004, CipherTrust is unaware of a single instance in which CipherTrust and Cybertrust competed for the same business.

24.  CipherTrust's flagship product is an email security appliance marketed under the name IRONMAIL.  Trans. at 22, 58; DTX

-8-

72 and 85.  Cybertrust does not manufacture any computer hardware and does not sell any hardware branded as CYBERTRUST.  Trans. at 424.

25.    Cybertrust is a managed security services company. Cybertrust offers a variety of network and application penetration testing services.  CipherTrust does not offer any penetration testing services.  Cybertrust offers forensic support services. CipherTrust does not offer forensic support services.  Cybertrust offers identity management consultancy services. CipherTrust does not.  Cybertrust offers a service, Online Guardian that remotely manages and monitors network security products.  CipherTrust offers no comparable service.  Cybertrust owns and licenses root keys. CipherTrust does not own or license any root keys.

26.    Cybertrust owns a division, called ICSA Laboratories, that tests and certifies information security products. CipherTrust offers no comparable service.  Cybertrust offers a software application, called Risk Commander that measures the current state of a company's compliance with policies or regulations.  Cybertrust offers network vulnerability assessment services.  CipherTrust does not.  Cybertrust offers PKI systems. CipherTrust does not.  CipherTrust does not offer disaster recovery services.   CipherTrust does not sell authentication tokens. Cybertrust sells certificate authority software.  CipherTrust does not. Cybertrust sells certificate authority software.  CipherTrust

does not.   Cybertrust sells SSL certificates.   CipherTrust does
not.

27.   CyberTrust offers a software development tool, called Key
Tools, which is an "add on" tool designed to allow customers to use
digital certificates with certain applications.   CipherTrust does
not sell a comparable product or service.    Cybertrust offers
intrusion detection services.   CipherTrust's intrusion detection
functionality is limited to email and is built into its IRONMAIL
appliance.   CipherTrust's Threat Response Update (TRU) service is
designed to work with its IRONMAIL email appliance and even has the
ability to reconfigure IRONMAIL appliances remotely to deal with
perceived email threats.   TRUs warn customers about email threats.

28.   CipherTrust has closed hundreds of deals since September
2004.   Trans. 162.   Yet, CipherTrust cannot identify a single
instance in which CipherTrust competed with Cybertrust for an
account.   Id.

29.   Cybertrust has a small legacy email firewall service,
Managed Email Firewall, that TruSecure inherited through an earlier
acquisition.   Of Cybertrust's approximately 4,000 customers, only
11 subscribe to its managed email firewall service.  Cybertrust has
not added a new email firewall customer since the merger was
announced in September 2004.  No one has ever approached Cybertrust
specifically for the purpose of buying an email security solution.

30.   Consumers of information security services are
sophisticated, and they have become more sophisticated over time.
Indeed, recent statutes and regulations (e.g., HIPPA and Sarbanes
Oxley) have forced companies to "open up their networks" to
information security vendors.   The individuals at companies
involved in the decision to purchase information security solutions
tend to be Chief Technology Officers, Chief Security Officers, Vice
Presidents, and senior Information Technology personnel.   These
people understand the information security challenges their
companies face and what they are trying to protect.

31.   Companies do not buy information security products and
services impulsively.   They take extreme care in making the
purchase decision.   The typical sales cycle for CipherTrust's
products and services ranges between 2 weeks and 3 months.   The
typical sales cycle for Cybertrust's services is 6-9 months.   The
parties' respective offerings are expensive. CipherTrust's average
transaction is approximately $50,000. Trans. at 160. Cybertrust's
average transaction is between $50,000 and $100,000.

32.   A typical Cybertrust transaction goes through the
following process: (1) an initial meeting to introduce Cybertrust
to the customer and to understand the customer's "pain points"; (2)
an invitation by the customer to respond to Request for Information
(RFI); (3) a response to RFI, by the vendor, which allows the
customer to narrow its list of potential vendors to 0 or 20; (4)

the customer evaluates RFI responses and narrows field of vendors further; (5) the customer issues Request for Proposal (RFP) seeking extensive information about each vendor's capabilities, experience, financial stability, price, etc.; (6) a response to RFP; (7) the customer narrows field of potential vendors further; (8) the remaining vendors are invited to make face-to-face presentations to the customer; (9) the customer selects a vendor; and (10) the customer and vendor negotiate service agreement.  This process involves extensive interaction with the prospective customer.

33.   The vast majority of Cybertrust's sales of Online Guardian go through the foregoing process, and all Risk Commander sales go through this process.  CipherTrust admitted to the United States Patent and Trademark Office (PTO) that its customers are "highly sophisticated corporate information security managers." PTX 119.

34.   CipherTrust's logo and Cybertrust's logo are visually distinct.  CIPHERTRUST is comprised of 11 letters, whereas CYBERTRUST is comprised of only ten.  CipherTrust typically uses a tagline, such as "The Leader of Messaging Security," with its logo and instructs its resellers to do the same.  CipherTrust's products bear the IRONMAIL mark as well as the CIPHERTRUST mark.

35.  Before applying to register CIPHERTRUST in November 2000, CipherTrust had its counsel, Miller & Martin, perform searches to identify any "potentially confusing marks."   Although both

-12-

CYBERTRUST registrations were issued in 1998, CYBERTRUST did not appear in the searches Miller & Martin conducted in November 2000. The PTO Examining Attorney did not cite CYBERTRUST against the CIPHERTRUST application.

36.   Out of an abundance of caution, Defendants sought the advice of their trademark counsel prior to selecting CYBERTRUST as the name of the merged entity.   Susan Weller, Cybertrust's trademark counsel, with twenty years of experience as a trademark practitioner, ordered a comprehensive trademark search for the mark CYBERTRUST.   She analyzed the voluminous results of that search and concluded, *inter alia*, that CYBERTRUST and CIPHERTRUST were not confusingly similar.

37.   Attorney Weller's determination that CYBERTRUST and CIPHERTRUST were not confusingly similar was based, in part, on the fact that the dominant portions of the respective marks ("cipher" and "cyber") created fundamentally different impressions. Specifically, "cipher" relates to encryption, whereas "cyber" relates to computers generally, and has nothing to do with encryption.   Such determination is confirmed by CipherTrust admission to the PTO that "cipher" relates to encryption and "is suggestive of a cryptographic system."   Cybertrust's trademark counsel also concluded that the field is crowded with CYBER and CIPHER marks.   This conclusion is supported by the sheer size of the Thomson & Thomson search results as well as the searches

CipherTrust's counsel (Miller & Martin) performed in 2000.

38.    While some of the TruSecure, Betrusted, and Ubizen executives were aware of the CIPHERTRUST mark when they selected CYBERTRUST as the name for the merged entity, there was no intention to cause marketplace confusion.    Cybertrust has not benefitted from any similarity between the marks CYBERTRUST and CIPHERTRUST.    Indeed, Cybertrust is not profitable, and the merged entity's financial performance is consistent with the separate performance of TruSecure, Betrusted, and Ubizen.

39. Jagtar ("Jay") Chaudhry founded CipherTrust in early 2000 and incorporated the company in February 2000.   Prior to founding CipherTrust, Mr. Chaudhry had worked as a Senior Vice President of VeriSign.    Between 1996 and 2000, VeriSign was on of GTE CyberTrust's primary competitors.   In fact, VeriSign identified GTE CyberTrust as one of its principal competitors in documents it filed with the Securities and Exchange Commission in 1998 and 1999 (during Mr. Chaudhry's tenure with VeriSign).

40.   In July 1998, VeriSign issued a press release announcing its acquisition of SecurIT.   In this press release, Mr. Chaudhry offered the following quote, "[w]e think the next natural step is to expand the use of digital certificates and PKI to enable more advanced solutions such as virtual private networks and secure messaging."

41.   Despite being a Senior Vice President of VeriSign from 1998 to 1999, Mr. Chaudhry claims that he had never heard of GTE CyberTrust (or the name/mark CYBERTRUST) prior to selecting "CipherTrust" as the name of his new company in early 2000.  In fact, Mr. Chaudhry claims that he first heard the name/mark CYBERTRUST in September 2004.

42.   Dr. Paul Judge is CipherTrust's Chief Technology Officer (CTO).   He received a Ph.D. from the Georgia Institute of Technology in 2000.  Although Dr. Judge studied virtual private networks while pursing his doctorate in computer science, and although Dr. Judge personally designed CipherTrust's VPN product, and despite the fact that GTE CyberTrust is prominently featured in the 1999 edition of <u>Virtual Private Networks for Dummies</u>, Dr. Judge claims he never heard of GTE CyberTrust prior to September 2004.

43.   Although CipherTrust claims that Defendants had abandoned the CYBERTRUST mark prior to the September 2004 merger announcement, CipherTrust executives (Steven Raber, Matthew Anthony, and Paul Judge) testified at trial that numerous people had mistakenly refereed to CipherTrust as "Cybertrust" long before the September 2004 merger announcement.  Trans. at 27, 163-66.  In fact, Mr. Raber testified that he could not say whether it had happened "once or a thousand times."  Glenn Esposito, a CipherTrust salesperson, admitted that his customers had been confusing the

-15-

names "CipherTrust" and "Cybertrust" since as early as 2000 or 2001.  Trans. at 232-33.

44.  The Court finds not credible Mr. Chaudhry's and Dr. Judge's claim to have been unaware of the name/mark CYBERTRUST prior to September 2004.

45.  CipherTrust applied to register the mark CIPHERTRUST in November 2000.  In April 2001, the PTO Examining Attorney issued an Office Action suspending CipherTrust's application because she was concerned that CIPHERTRUST might be confusingly similar to five previously applied-for marks: CIPHERTEXT, CYPHERVAULT, CIPHERFILE, CYPHERBANK, and CIPHERLOCK.

46.  In an effort to persuade the PTO Examining Attorney that CIPHERTRUST was not confusingly similar to the cited marks, CipherTrust filed a Response to the Office Action on October 25, 2001.  CipherTrust made several representations to the PTO Examining Attorney in its Response.  For example, CipherTrust argued that the word "CipherTrust" suggests "confidence in the integrity of a cryptographic system."  CipherTrust also represented that it makes a self-contained security appliance, or "black box," which is distinguishable from the products/services offered in connection with the cited marks.  That its customers are "highly sophisticated corporate information technology managers," who would not likely be confused by a similarity between marks.  CipherTrust

also argued that the "vast computer field" is comprised of "disparate segments."

47.    CipherTrust's arguments were successful; CipherTrust persuaded the PTO Examining Attorney to allow the CIPHERTRUST application to be published for opposition. A federal registration for CIPHERTRUST issued on December 31, 2002 for the following goods: "computer hardware and software integrated therewith for use in the secure electronic transmission of data over computer networks and instruction manuals sold as a unit therewith." DTX 132 at CIPHER001529 (U.S. Registration No. 2,669,929 (the "'929 Registration'")).

48.    Any goods or services not described in the '929 Registration do not fall within the ambit of that registration. Thus, CipherTrust can only rely on common law trademark or service mark rights in connection with goods or services that fall outside the scope of the '929 Registration.   Indeed, because the '929 Registration covers goods, it does not extend to any services. CipherTrust failed to establish at trial the priority date (i.e., the date of the first use in commerce, if any) for any uses not covered by the '929 Registration.

49.    PTX 228 (e-mail from Sophos to CipherTrust) is not evidence of actual confusion. The sender of that e-mail does not exhibit any confusion between the companies or their respective offerings.   In fact, Mr. Raber admitted that the sender is not

confused "in the slightest." PTX 229 (e-mail from Goldman Sachs to CipherTrust) is not evidence of actual confusion. The sender of that e-mail does not exhibit any confusion between the companies or their respective offerings. PTX 230 (e-mail from Wal-Mart to CipherTrust) is not evidence of actual confusion. The sender of that e-mail does not exhibit any confusion between the companies or their respective offerings. Charles Balla exhibited no confusion between CIPHERTRUST and CYBERTRUST. Todd Greene exhibited no confusion between CIPHERTRUST and CYBERTRUST. Ryan LaFond exhibited no confusion between CIPHERTRUST and CYBERTRUST. Gary McGlaughlin exhibited no confusion between CIPHERTRUST and CYBERTRUST. Michael Polick exhibited no confusion between CIPHERTRUST and CYBERTRUST. Tony Richardson exhibited no confusion between CIPHERTRUST and CYBERTRUST. Lane Segrest exhibited no confusion between CIPHERTRUST and CYBERTRUST.

50. CipherTrust's executives admit that prior to the September 2004 merger announcement, numerous people had mistakenly referred to CipherTrust as "Cybertrust." In fact, one CipherTrust salesperson testified that his customers had been confusing the names "CipherTrust" and "Cybertrust" since as early as 2000 or 2001.

51. Despite hundreds of client interactions since September 2004, not a single Cybertrust customer has expressed confusion between CYBERTRUST and CIPHERTRUST.

-18-

52.   CipherTrust did not offer any survey evidence to support its claim of likely confusion.  The Court finds it unlikely that an appreciable number of ordinarily prudent consumers will be confused as to source or sponsorship between CYBERTRUST and CIPHERTRUST.

53.   Any potential confusion between CYBERTRUST and CIPHERTRUST is outweighed by the fact that: (1) "ordinary" purchasers of information security solutions are highly sophisticated corporate information technology managers; (2) information security solutions are expensive; (3) purchasers of information security solutions take great care in making such decisions; and (4) CipherTrust can point to no evidence of actual confusion.

54.   CipherTrust cannot identify a single sale lost as a result of Defendants' use of the CYBERTRUST mark.  CipherTrust offered no evidence at trial to support a claim of lost profits.  In fact, CipherTrust's sales have increased since September 2004, and the first quarter of 2005 was a record quarter for CipherTrust.

55.   CipherTrust offered no evidence at trial to support a claim that it has been harmed in any way by Defendant's use of the CYBERTRUST mark.  Indeed, any confusion between CIPHERTRUST and CYBERTRUST alleged by CipherTrust's witnesses at trial has, by CipherTrust's own admission, been occurring for years, long before the September 2004 merger announcement.

56.  Defendants failed to make the necessary Section 8 renewal submissions for their '469 Registration because they were not aware of the requirement.  As soon as Defendant's became aware of the requirement to make a Section 8 submission for the '469 Registration, they attempted to do so.  However, the deadline had passed and could not be extended.

57.  As a result of their failure to make a Section 8 submission, the PTO canceled the '469 Registration.  Defendant's failure to make the Section 8 submission for the '469 Registration was inadvertent.  Trans. at 531.

58.  The affidavit Defendants submitted to the PTO in support of their Section 8 renewal filing for the '764 Registration was truthful because Defendants were, in fact, using the CYBERTRUST mark on, or in connection with, online user certification services for others.  Specifically, Defendants (and their predecessors) have never ceased using the CYBERTRUST mark in connection with the online sale of SSL certificates, which certificates are issued after the identity of the website is validated.  Because the affidavit was truthful, there can be no fraud.  The specimen Defendants submitted in support of their Section 8 renewal filing for the '764 Registration was appropriate because it showed current use of the CYBERTRUST mark.  Because the specimen submitted by Defendants was appropriate, there can be no fraud.

59.  In September 2003, Baltimore agreed to sell its PKI

business to Betrusted.   Kelly Dep. at 27, 32-33.   Prior to September 2003, both parties had agreed that Betrusted would purchase Baltimore's entire PKI business, including the OmniRoot and UniCERT businesses and the CyberTrust Roots, which included all rights in the CYBERTRUST mark and all of the goodwill associated with the mark.

60.  For business reasons, Baltimore broke the PKI transaction into two separate agreements, which were executed two weeks apart. However, both parties always understood that Betrusted would purchase Baltimore's entire PKI business, and there was never any intent to separate any aspect of the PKI business from the PKI trademark and service marks (including the CYBERTRUST mark).

61.  As soon as Baltimore executed the first agreement, it ceased all use of the GTE Cybertrust mark because Baltimore understood that Betrusted was the new owner of the Cybertrust mark and its associated goodwill.  Consistent with the agreement between the companies, Betrusted did, in fact, purchase the entire PKI business from Baltimore.

## **CONCLUSIONS OF LAW**

To prevail on a claim of false designation of orgin under the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051-1127 (2000), a plaintiff must prove the following by a preponderance of the evidence:

> (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred "in commerce"; (4) that the defendant used the mark "in connection with the sale, offering for sale, distribution, or

advertising" of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.

People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125(a); Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 930 (4th Cir. 1995)).

To prevail on an infringement claim of a registered trademark under the Lanham Trade-Mark Act, a plaintiff must prove by a preponderance of the evidence that: 1) its mark has been registered as a trademark or service mark on the principal register in the PTO; 2) that it is the registrant of its registered mark; 3) that it has priority; and 4) that the defendant used its own mark without the plaintiff's consent in a manner that is likely to cause confusion among "an appreciable number of ordinarily prudent purchasers." See 15 U.S.C. § 1114(1); Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 804 (4th Cir. 2001); Lone Star Steakhouse & Saloon, 43 F.3d at 930, Perini Corp., 915 F.2d at 124. The Fourth Circuit has further held that "[c]onfusion or likelihood or confusion is a question of fact..." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 469 (4th Cir. 1996).

The Court finds that CipherTrust has failed to prove that there is likelihood of confusion in the marketplace among an appreciable number of ordinarily prudent purchasers as to the source of sponsorship of the goods and services sold under CIPHERTRUST and CYBERTRUST marks.

-22-

When the PTO issues a certificate of federal registration to the owner of a trademark or service mark, "that registration provides the registrant with prima facie evidence of: (1) the validity of the mark and its registration; (2) the registrant's ownership; and (3) the registrant's 'exclusive right' to use [that] mark [nationwide] on or in connection with the goods and services specified in the certificate of registration." U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d at 524; see also 15 U.S.C. § 1057(b); America Online, Inc. v. AT&T Corp., 243 F.3d 812, 816 (4th Cir. 2001); Brittingham v. Jenkins, 914 F.2d 447, 452-53 (4th Cir. 1990).  Use of the mark on any other goods and services not specified in the registration constitutes common law use.

Federal registrations are presumed to be valid.  Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc., 892 F.2d 1021, 1023-24 (Fed. Cir. 1989); see 15 U.S.C. § 1057(b).

"[Federal] registration of a ... mark does not grant any rights greater than those acquired at common law." Armand's Subway, Inc. v. Doctor's Assoc., Inc., 1978 U.S. Dist. LEXIS 18329, at *21 (E.D. Va. Apr. 18, 1978); see Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 816 (1st Cir. 1987); California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1454 (9th Cir. 1985).  Thus, "it is not registration, but only actual use of a designation as a mark that creates rights and priority over others." 2 J. Thomas McCarthy, McCarthy on Trademark

-23-

and Unfair Competition, § 16:6, at 16-6 (4th ed. 2005); see
Humanoids Group v. Rogan, 375 F.3d 301, 305 (4th Cir. 2004) (noting
that "all ownership rights in a mark flow from prior use" and not
from federal registration).

CipherTrust can only claim the benefit of a federal
registration for the goods set forth in the registration, namely:
"computer hardware and software integrated therewith for use in the
secure electronic transmission of data over computer networks and
instruction manuals sold as a unit therewith."  As such,
CipherTrust can only claim common law rights and protection for
uses of the CIPHERTRUST mark that relate to goods or services other
than computer hardware, for use in the secure electronic
transmission of data over computer networks.

"When more than one user claims the exclusive right to use an
unregistered trademark, priority [of use] is determined by 'the
first actual use of [the] mark in a genuine commercial
transaction.'" Emergency One, Inc. v. Am. Fire Eagle Engine Co.,
332 F.3d 264, 267 (4th Cir. 2003) (citing Allard Enters., Inc. v.
Advanced Programming Res., Inc., 146 F.3d 350, 358, (6th Cir.
1998)).  "The first user ... to appropriate and use a particular
mark-the 'senior' user-generally has priority to use the mark to
the exclusion of any subsequent-or junior-users of confusingly
similar marks." Id. at 268.  As such, the senior user's mark is
"given legal protection against infringement immediately upon

-24-

adoption and use is trade." 2 McCarthy § 16:4, at 16-6.

The Court finds that Cybertrust, through it predecessors, used the CYBERTRUST mark for at least four years prior to CipherTrust's adoption and use of the CIPHERTRUST mark. As such, Cybertrust has priority over CipherTrust with respect to their respective marks.

For purposes of establishing priority, as the senior user, Cybertrust's rights in the CYBERTRUST mark are not limited to the goods and services offered under their mark. Under the doctrine of natural expansion, Cybertrust has "the right to expand and extend its [goods or services] under the said mark." See J.C. Penney Co., Inc. v. Security Tire & Rubber Co., Inc., 382 F. Supp. 1342, 1344 (E.D. Va. 1974); see Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1312-1313 (11th Cir. 1999) (citing J.C. Penney Co., 382 F. Supp. at 1344). "An expansion of market is 'natural' if, at the time when the junior user began use [of its mark], purchasers would have been likely to be confused as to source or as to sponsorship, affiliation or connection" of the goods or services offered under the parties' marks. 4 McCarthy § 24:20, at 24-43. Thus, ["[w]hen a senior user of a mark on product line A expands later into product line B and finds an intervening user, priority in product line B is determined by whether the expansion is 'natural' in that customers would have been confused as to the source or affiliation at the time of the intervening user's appearance."] 2 McCarthy § 16:5, at 16-8 (citing J.C. Penney Co.,

-25-

Inc., 382 F. Supp. 1342) (further citations omitted).

"In determining possible expansion of a product line, it is the ordinary customer's perception of possible expansion that counts, whether that perception comports with the reality of the senior user's actual plans or not." 4 McCarthy § 24:19, at 24-39; see Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1202 (11th Cir. 2001). "This is so even though [the senior user's] extension of its [goods or services] began subsequent to [the junior user's] sale of [such expanded goods or services]." J.C. Penney Company, Inc., 382 F. Supp. at 1344; see Interstate Net Bank v. NetBank, Inc., 221 F. Supp, 2d 513, 520 (D.N.J. 2002) (noting that "under natural expansion, where another user intervened, plaintiff's scope of trademark protection extended from the initial use of the...mark...to its current use..").

In light of the findings of fact made after a trial on the merits, including without limitation, Mr. Chaudhry's statement that CipherTrust's "next natural step is to expand the use of digital certificates and PKI to enable more advanced solutions such as virtual private newtworks and secure messaging," the Court finds that Cybertrust's expansion from PKI-related solutions to other information security services offered under the CYBERTRUST since September 2004 was a "natural" expansion of its product line.  As such, Cybertrust has priority of use for all of the services offered under the CYBERTRUST mark since September 2004.

-26-

"Once a particular mark or name is deemed eligible for protection, the inquiry for determining if it has been infringed is whether [the use] of an identical or similar mark or name creates a 'likelihood of confusion.'" Perini Corp., 915 F.2d at 124.

The ultimate question in both a trademark infringement claim and a false designation of origin claim is "whether there exits a 'likelihood that an appreciable number of ordinarily prudent purchasers will be mislead, or indeed simply confused, as to the source of the goods [or services] in question.'" Id. at 127 (quoting Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978); see U.S. Search, LLC, 300 F.3d at 523.

The Fourth Circuit considers the following factors to determine whether a defendant's use of its mark is likely to cause confusion among an "appreciable number of ordinarily prudent purchasers" in the marketplace as to the source of the goods and services offered by the parties:

(1) the strength or distinctiveness of the plaintiff's mark;

(2) the degree of similarity between the two marks;

(3) the similarity of the goods and services offered under the two marks.

(4) the level of sophistication and care consumers use when purchasing goods and services offered under the two marks;

(5) the similarity of the facilities the parties use in their respective businesses;

(6) the similarity of the advertising the parties use;

(7) the junior user's intent in adopting its mark;

(8)  evidence of actual confusion caused by defendant's use of its mark.

See Perini Corp., 915 F.2d at 127; Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984).  Another factor courts often consider is the cost or expense of the products or services at issue.  Jet, Inc. v. Sewage Aeration Sys., 165 F.3d 419, 423 (6th Cir. 1999) (noting "the high cost of either product...is likely to induce great care even in the non-expert homeowner").  However, the Fourth Circuit has cautioned that "'not all these [factors] are always relevant or equally emphasized in each case.'" Pizzeria Uno Corp., 747 F.2d at 1527 (further citation omitted).

The multi-factor analysis is designed to ensure that the fact finder evaluates potential confusion in the "real world," i.e., under actual market conditions.  See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1106 (6th Cir. 1991).

A mark's strength is of "paramount" importance in assessing likelihood of confusion.  Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987); Pizzeria Uno Corp., 747 F.2d at 1527.  The strength of a mark "'ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.'" Petro Stopping Ctrs., L.P., 130 F.3d at 93. The key inquiry is the source-identifying impact the mark has on

consumers.  As such, evidence merely demonstrating how much money a party spends to advertise the goods and services offered under its mark is "meaningless when there is no showing that such expenditures caused consumers to associate the mark with its source."  Dicks's Sporting Goods, Inc. v. Dick's Clothing and Sporting Goods, Inc., 1999 U.S. App. LEXIS 19942, at *20 (4th Cir. Aug. 20, 1999) (unpublished); see 1 McCarthy § 15:51, at 15-81.

Even if CipherTrust is the valid owner of a registered mark, its mark may be so weak or indistinctive that an appreciable number of ordinarily prudent consumers are not likely to be confused by the use of a similar mark.  Lone Star Steakhouse & Saloon, 43 F.3d at 935; see Perini Corp., 915 F.2d at 124.  Thus, even a suggestive mark may be deemed weak and worthy of little protection.  Petro Stopping Ctrs., L.P., 130 F.3d at 93; CareFirst of Md., Inc. v. First Care, P.C., 350 F. Supp. 2d 714, 721-22 (E.D. Va. 2004).

The greater the number of users of marks containing the world "CIPHER" or "CYBER," the weaker the overall strength of each mark and the less likely it is that the public will be confused by the use of the same or similar mark on other goods and services.  See Petro Stopping Ctrs., L.P., 130 F.3d at 93; Washington Speakers Bureau, Inc. v. Leading Auths., Inc., 33 F. Supp. 2d 488, 497 (E.D. Va. 1999); see also Time, Inc. v. Peterson Publ'g Co., LLC, 173 F.3d 113, 118 (2d Cir. 1999) (stating "[t]he use of part or all of the mark by third parties weakens the overall strength");

Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 744 (2d Cir. 1998) (finding that third party use of the works "street" and "wise" served to weaken the strength of the mark STREETWISE).  This is known as the "crowded field" doctrine.  Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1998).

In a "crowded field" of similar marks, each mark is relatively "weak" in terms of its ability to prevent use by others in the marketplace.  Id.; Entrepreneur Media v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002) (noting that in a crowded marketplace, customers are unlikely to be confused as to the source of good or services the marks identify and may have learned to carefully differentiate one  more from another).  "Simply put, 'a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive.'  It is merely one of a crowd of marks.'" Miss World (UK) Ltd., 856 F.2d at 1449.

CipherTrust offered no evidence at trial suggesting that the CIPHERTRUST mark is strong.  Indeed, CipherTrust offered no evidence at trial suggesting that consumers of information security solutions associate the CIPHERTRUST mark with its source. Cybertrust introduced evidence showing that the CIPHERTRUST mark is one of a crowd of similar marks containing the terms CIPHER, CYBER, or TRUST, or variations thereof, and thus the CIPHERTRUST mark must be considered relatively weak and indistictive.  The Court finds

-30-

that this factor weighs against finding a likelihood of confusion and in favor of Cybertrust.

Because almost every trademark infringement case "involves marks that are similar at some level," the overall test under the similarity of the marks factor is "whether there exists a 'similarity in appearance and sound which would result in confusion'" as viewed by the ordinary customer who purchases such goods and services. Petro Stopping Ctrs., L.P., 130 F.3d at 94; see Anheuser-Busch, Inc., 962 F.2d at 319; Pizzeria Uno Corp., 747 F.2d at 1534. Such an evaluation requires a broad and flexible analysis which focuses "on the marks in their entirety, including the salient differences in the marks themselves and in terms of other trademarks, color, terms, symbols and designs used in conjunction with the marks in the actual marketplace." Miquel Torres, S.A. v. Cantine Mezzacorona, S.C.A.R.L., 1999 U.S. Dist. LEXIS 19278, at *27 (E.D. Va. June 11, 1999) (unpublished); see Homeowners Group, Inc., 931 F.2d at 1109 (stating "[i]t is the mark in its entirety, and how it is actually seen in the marketplace, that must also be compared to the relevant mark"). "[S]imilarity of the conflicting names is but one of many factors relevant to a determination of whether the concurrent use of the marks creates a likelihood of confusion." What-A-Burger of Va., Inc. v. Whataburger, Inc., 357 F.3d 441, 449 n.6, 450 (4th Cir. 2004).

To determine whether the marks are similar, the Court "cannot

rest solely upon a 'side-by-side' comparison of the marks without regard to the marketplace in which they are used." Id. Accordingly, the Court should compare the CIPHERTRUST and CYBERTRUST marks "in...light of what occurs in the marketplace, not in the courtroom." Beer Nuts, Inc. v. Clover Club Rooms Co., 711 F.2d 934, 941 (10th Cir. 1983) (quoting James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976)).

Although the Court should consider the mark as a whole when evaluating the similarity of the two marks, "this principle, however, does not mean that the court is precluded from examining the meanings of the component words in evaluating the mark as a whole." College Craft Enterprises, Ltd. v. College Crew Painters, 1986 U.S. Dist. LEXIS 18490, at **5-6 (N.D. Ill. 1986). When certain portions of the mark are more dominated than others, the Court should give greater weight to those dominant portions. 3 McCarthy § 23:42, at 23-127.

If the CIPHERTRUST mark is typically used in conjunction with another well known mark, this fact reduces, if not eliminates, the likelihood of confusion in the marketplace. See Bristol-Myers Squibb Co. v. McNeill-P.P.C., Inc., 973 F.2d 1033, 1046 (2d Cir. 1992) (stating that "the prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion"); Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha, 290 F. Supp. 2d 1083, 1093 (C.D. Cal. 2003).

"CIPHER" and "CYBER" are the dominant portions of the parties' respective marks and that "TRUST" is a common suffix that should have little, if any, impact on the similarity analysis. CipherTrust's common use of the well known IRONMAIL mark in conjunction with its email security products and services serves to further distinguish the parties' respective marks in the marketplace. Also, CipherTrust's admission to the PTO that CIPHERTRUST connotes "confidence in the integrity of the cryptographic system," a connotation not attributable to CYBERTRUST, further serves to differentiate the parties' respective marks in the marketplace.

The Court finds that the marks are not similar as used in the real world and that any similarity in appearance and sound would not result in confusion. Accordingly, this factor weighs against finding a likelihood of confusion and favors Cybertrust.

"Differences in the goods [or services] on which the marks appear are probative of the absence of likelihood of confusion." IDV N. Am. v. S&M Brands, 26 F. Supp. 2d 815, 826 (E.D. Va. 1998) (citing Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 94 (4th Cir. 1997)).

When evaluating the similarity of the goods and services offered under the marks, "the mere fact that 'two products or services fall within the same general field...does not mean that the two products or services are sufficiently similar to create a

likelihood of confusion.'" <u>Matrix Motor</u>, 290 F.Supp. 2d at 1092 (citation omitted); <u>see</u> <u>Yellowbrix, Inc. v. Yellowbricks Solutions, Inc.</u>, 181 F.Supp. 2d 575, 580 (E.D.N.C. 2001) (finding that the similarity of goods and services factor weighed against a likelihood of confusion where plaintiff offered web-based technology to customize customer websites and defendant offered software to allow integration of consumer information).

The Court finds that the parties offer markedly different goods and services and do not compete in the marketplace. CipherTrust is an email security company, whereas Cybertrust is a managed security services company offering a broad array of services that do not relate to email. Accordingly, this factor weighs against finding a likelihood of confusion and favors Cybertrust.

"[T]he sophistication and expertise of the usual purchasers can preclude any likelihood of confusion..." among similar marks. <u>Perini Corp.</u>, 915 F.2d at 127; <u>Star Indus. v. Bacardi & Co.</u>, 412 F.3d 373, 389 (2d Cir. 2005) (stating that "[t]he 'consumer sophistication' factor militates against finding a likelihood of confusion.").

If "consumers of [p]laintiff's and [d]efendant's products and services are knowledgeable about technology and the differences therein[,]...they may not be easily 'confused.'" <u>Yellowbrix</u>, 181 F.Supp. 2d at 581 n.3. Thus, "[t]he sophistication of the generally

technologically-savvy consumers at issue in this case supports [a] finding that consumer confusion is relatively unlikely." Id.

This heightened standard of care is especially true in area of information security technology where:

> purchasers of...firewall technology are highly technical computer and information specialists that must ensure the software is compatible with other programs...Because of the respective products' importance to their buyers' security needs and their high cost, consumers take care in making purchasing decisions and are not likely to be confused by...similar marks."

Checkpoint Sys.s, Inc. v. CheckPoint Software Tech.s, Inc., 269 F.3d 270, 285-86 (3d Cir. 2001).

A Court should consider the cost and type of the product in addition to conditions of purchase to determine "'whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist.'" SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980); see Perini Corp., 915 F.2d at 127; Astra Pharm. Prod.s, Inc. v. Beckham Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983). "A realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine not what it [the court] would do, but what a reasonable purchaser...would do." Calvin Klein Cosmetics Corp. v. Lenox Lab.s, Inc., 815 F.2d 500, 504 (8th Cir. 1987). Thus, the likelihood of confusion analysis requires the Court to look at the marketplace and the purchasing environment as if through the eyes

of the person who would, in the real world, be involved in making the decision to purchase the goods and services offered under the marks.

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions,...there is not a strong likelihood of confusion." Checkpoint Sys., Inc., 269 F.3d at 284; see Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp., 954 F.2d 713, 718 (Fed. Cir. 1992) (stating that "[t]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration."(citation omitted)); Wash. Nat'l Ins. Co. v. Blue Cross and Blue Shield United of Wis., 727 F. Supp. 472, 475 (N.D. Ill. 1990).  In fact, "[w]here the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." Checkpoint Sys., 269 F.3d at 284.  In some instances, "a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." Star Indus., 412 F.3d at 390.

Considering the evidence, including Ciphertrust's admission to the PTO that the consumers of its products are "highly sophisticated corporate information technology managers," the Court finds that the consumers of the goods and services sold under the marks are highly sophisticated individuals who are not likely to be confused by any similarity between the parties' respective marks.

-36-

The Court further finds that the sales cycle for information security solutions is considerable (often spanning many months), that consumers of such solutions exercise heightened care before making purchasing decisions, and that such solutions are very expensive (typically costing tens of thousands of dollars). Accordingly, this factor weighs heavily in favor of Cybertrust and precludes a likelihood of confusion.

In this case, the Court further finds that the sophistication factor is entitled to considerable weight in the analysis, as the Court concludes that the sophistication of ordinary purchasers of information security solutions will negate any likelihood of confusion in the marketplace.

In evaluating a party's intent in adopting a particular mark,"'the second comer has a duty to so name...[its] product as to avoid all likelihood of consumers confusing it with the product of the first comer.'" Osem Food Indus., Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 (4th Cir. 1990) (quoting AMP, Inc. v. Foy, 540 F.2d 1181, 1187 (4th Cir. 1976) (citation omitted)).  As such, "when one adopts a mark similar to one already in use, there is an affirmative duty to avoid any likelihood of confusion." Volkswagenwerk Aktiengesellscahft, 814 F.2d at 817.

CipherTrust offered no evidence at trial suggesting that Defendants acted in bad faith by selecting CYBERTRUST as the name for the merged entity.  To the contrary, Defendants reasonably (and

accurately) believed that they held valid rights in the CYBERTRUST mark dating back to 1996, when GTE CyberTrust was formed. Moreover, out of an abundance of caution, Defendants sought and obtained an opinion from their trademark counsel, who concluded that CYBERTRUST and CIPHERTRUST were not confusingly similar. Accordingly, the Court finds that Cybertrust did not act in bad faith, and thus, this factor favors neither side in the confusion analysis.

Although no one factor is decisive, the absence of actual confusion in the marketplace provides "the most compelling evidence of [no] likelihood of confusion." Lone Star Steakhouse & Saloon, 43 F.3d at 937; see Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp., 148 F.3d 417, 422 (4th Cir. 1998) (noting that "[e]vidence of actual confusion is of paramount importance in this analysis"); Lyons P'ship, 243 F.3d at 804 (noting that the actual confusion factor is often paramount). The absence of "substantial actual confusion...will often by itself answer the question as to whether there is a 'likelihood of confusion' between the two marks at issue." Giant Brands, Inc. v. Giant Eagle, Inc., 228 F.Supp. 2d 646, 654-55 (D. Md. 2002) (citing Anheuser-Busch, Inc., 962 F.2d at 320).

In evaluating the actual confusion factor, "[r]elevant confusion is that which affects the purchasing and selling of the goods or services in question...Trademark infringement protects

only against mistaken purchasing decisions and not against confusion generally." Sterling Acceptance Corp. v. Tommark, Inc., 227 F.Supp. 2d 454, 464 (D. Md. 2002) (citation omitted), aff'd, 91 Fed. Appx. 800 (4th Cir. 2004)(unpublished); see Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 636 (6th Cir. 2002) (noting that "occasional cases of confusion or thoughtless error by very inattentive purchasers are of very little significance in trademark and unfair competition cases" (quoting S.C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129, 141 (6th Cir. 1959)); Chum Ltd. v. Lisowski, 198 F.Supp. 2d 530, 540 (S.D.N.Y. 2002) (finding that evidence of confusion among industry professionals rather than actual consumers does not constitute evidence of actual confusion and weighs against a finding of likelihood of confusion).

"There is no actual confusion where, 'no evidence links the confusion evinced by the [consumer] to any potential or actual effect on consumers' purchasing decisions.'" RFE Indus., Inc. v. SPM Corp., 1998 U.S. Dist. LEXIS 6245, at **29-30 (W.D. Va. Mar. 23, 1998) (citation omitted). Thus, only evidence of consumer confusion relating to the purchase of goods and services offered under the marks is relevant for purposes of the likelihood of confusion analysis. See Sterling Acceptance Corp., 227 F.Supp. 2d at 465; RFE Indus., 1998 U.S. Dist. LEXIS 6245, at *29.

The inability to identify an appreciable level of actual confusion after a substantial period of co-existence creates "a

presumption against likelihood of confusion in the future." Petro Stopping Ctrs., 130 F.3d at 95 (citation omitted).  Although evidence of actual confusion is not necessary to establish trademark infringement, "after the lapse of substantial time if no one appears to have been actually deceived[,] that fact is strongly probative of the defense that there is no likelihood of confusion." Scotch Whiskey Ass'n v. Majestic Distilling Co., 958 F.2d 594, 598 (4th Cir. 1992) (citation omitted).

If a plaintiff is not able to show any - or is only able to show a few - instances of actual confusion between the marks, such evidence of confusion is de minimis and weighs against finding a likelihood of confusion.  Petro Stopping Ctrs., 130 F.3d at 95. Moreover, a plaintiff's "failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future." Id. (citation omitted).

"Questions [by consumers] regarding the relationship between the trademark owner and an alleged infringer do not constitute actual confusion." Penta Hotels Ltd. v. Penta Tours, 1998 U.S. Dist. LEXIS 15713, at *84 (D. Conn. Sep. 30 1988).

Testimony by a company's employees relating to statements of alleged confusion made by individuals who did not appear in court or who did not offer testimony through a deposition is inherently unreliable.  See Star Indus., 412 F.3d at 387-88 (noting that actual confusion evidence consisting "entirely of testimony by

several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants" was "extremely weak"); Avery Dennison Corp. v. Acco Brands, Inc., 1999 U.S. Dist. LEXIS 21464, at *54 (C.D. Cal. Oct. 12, 1999).  This is especially true when the allegedly confused individuals offered sworn statements that they were not confused as to the source of the goods and services sold under the marks.

Evidence of "actual confusion" offered "by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving." Citizens Fin. Group, Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 122 (3d Cir. 2004); see Checkpoint Sys., 269 F.3d at 298; (noting that "the District Court properly took into account the potential bias of the Checkpoint Systems's employees who testified [regarding actual confusion]"); A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 227 (3d Cir. 2000) (noting that "[t]he District Court, while not explicitly discrediting this evidence, viewed it with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals").  Again, CipherTrust employee testimony should be viewed with even greater skepticism when the allegedly confused individuals offered sworn statements that they were not confused as to the source of the goods and services sold under the marks.

"[F]ailure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." Essence Comm'ns, Inc. v. Singh Indus., Inc., 703 F. Supp. 261, 269, (S.D.N.Y. 1988).

CipherTrust failed to introduce any evidence of actual confusion in the marketplace. The testimony offered by CiperTrust to show "confusion" at trade shows and during telephone calls or email exchanges was either: (1) expressly contradicted by testimony from the allegedly "confused" individuals; or (2) did not demonstrate confusion. The Court further finds that, even if such evidence did show confusion, the level of confusion shown is minuscule and, therefore, is de minimis.

As to initial interest confusion, the Fourth Circuit has never adopted the initial interest confusion theory, but has required a determination whether a likelihood of confusion exists by examining the alleged infringing use in the context in which it is seen by the ordinary consumer. In any event, the Plaintiff has failed to prove the likelihood of any confusion.

Abandonment of a mark occurs only when the owner of the mark: (1) discontinues use of the mark in commerce; and (2) does not intend to resume use of the mark in the reasonably foreseeable future. 15 U.S.C. § 1127.

As "abandonment constitutes a forfeiture of a property interest, both non-use and intent not to resume use must be

-42-

strictly proved." Seidelmann Yachts, Inc. v. Pace Yacht Corp., 1989 U.S. Dist. LEXIS 17486, at *16 (D.Md. Apr. 27, 1989) (citing Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985); see Cumulus Media, Inc. v. Clear Channel Commc'ns., Inc., 304 F.3d 1167, 1175 (11th Cir. 2002); Marshak v. Treadwell, 240 F.3d 184, 198 (3d Cir. 2001). Thus, the "plaintiff[] [is] required to prove abandonment [of the CYBERTRUST mark] by 'clear and convincing evidence.'" Eurotech, Inc. v. Cosmos European Travels Aktiengessellschaft, 213 F.Supp. 2d 612, 621 n.18 (E.D. Va. 2002)(citation omitted).

A mark is in use in commerce on goods and services when the mark is "used or displayed in the sale or advertising of services and the services are rendered in commerce..." 15 U.S.C. § 1127. "Use in commerce" means "'commercial use which is typical in a particular industry. Additionally, [use in commerce] should be interpreted with flexibility so as to encompass genuine, but less traditional trademark uses[.]'"White v. Paramount Pictures Corp., 1997 U.S. App. LEXIS 3079, at *7 (Fed. Cir. Feb. 21, 1997)(citation omitted).

In the context of an electronic file, like a root key licensed to be embedded in a browser, trademark use includes the transmission of the file from one party to another. See Planetary Motion, Inc., 261 f.3d at 1198. Indeed:

> [t]here is no support for the argument that for a
> trademark in software to be valid, the mark must appear

-43-

> on the box containing the product incorporating it, that
> the mark must be displayed on the screen when the program
> is running, or that the software bearing the mark be a
> selling point for the product into which it is
> incorporated.  There is no requirement that the public
> come to associate a mark with a product in any particular
> way or that the public be passive viewers of a mark for
> a sufficient public association to arise.

Id., at 1197-98 (noting that when software is incorporated into a product, the consumer or competitor would merely have to look at the user manual to discover the source of the software).

If the owner of a service mark uses the mark on or in connection with, or during the course of, rendering services, such use constitutes service mark use.  In re Metriplex, Inc., 1992 TTAB LEXIS 5, at **4-5 (TTAB June 8, 1992) (finding computer printouts to be acceptable specimens for service mark use when such printouts show the mark as it appears in the course of rendering the services).

A service mark is in "use in commerce" "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127.  "[T]here are two essential elements that must be present to constitute 'use in commerce' for Lanham Act purposes: (1) advertising that employs the mark and (2) the rendering of services to which the mark attaches." Int'l Bancorp., LLC v. Societe Des Bains De Mer Et Du Cercle Des Etrangers a Monaco, 329 F.3d 359, 383 (4th Cir. 2003)(Motz, J., dissenting).  Service mark "use" does not require and actual sale for a service mark to be in "use in commerce."  See Chance v. Pac-

Tel Teletrac Inc., 242 F.3d 1151, 1159 (9th Cir. 2001) (employing totality of circumstances test to determine whether a service mark is in use in commerce).

It is well settled that one can use more than one mark in connection with a service. See, e.g., Suntrek Tours, Ltd. v. Am. Pioneer Tours, Ltd., 1999 TTAB LEXIS 301, at *10 (TTAB July 13, 1999) (noting that "[s]ervices, as well as products, may be identified by more than one mark").

Federal trademark law "does not require a regular pattern of sales to prove use... Rather, the [law] requires nonuse (as opposed to irregular sales) and intent[]" to resume use in the reasonably foreseeable future. Emachines, Inc. v. Ready Access Memory, Inc., 2001 U.S. Dist. LEXIS 13904, at *26 (C.D. Calif. Mar. 5, 2001); see Emergency One, 228 F.3d at 538.

Use of a mark or name on a website "represents use in commerce establishing trademark rights. Such use is 'use in a way sufficiently public to identify or distinguish the marked goods [or services] in an appropriate segment of the public mind as those of the adopter of the mark.'" Online Partners.com, Inc. v. Atlanticnet Media Corp., 2000 U.S. Dist. LEXIS 783, at *17 (N.D. Cal. 2000) (quoting Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1052 (9th Cir. 1999)).

"Public recognition [by third parties] is probative of a party's actual use of a mark for the obvious reason that the public

cannot be aware of a mark's association with a service or product unless the party has actually used the mark to create the association." Circuit City Stores, Inc. v. CarMax, Inc., 165 F.3d 1047, 1055 (6th Cir. 1999).

Use of a mark on or in connection with the documentation associated with repairs and/or maintenance of a discontinued product may be "sufficient commercial use of the mark to prevent abandonment...'" Emergency One, 228 F.3d at 536.   Trademark use also occurs where the owner of a mark continues to offer services and/or collect royalties on discontinued products offered under the mark. See Emachines, 2001 U.S. Dist. LEXIS 13904, at *27 (finding no abandonment where the evidence showed that invoices and shipping statements contained the mark and plaintiff continued to service and refurbish its discontinued products); Ferrari S.p.A Esercizio Fabbriche Automobili e Corse v. McBurnie, 1989 U.S. Dist. LEXIS 13442, at *19 (S.D. Cal. June 4, 1989), aff'd, 994 F.2d 1235 (6th Cir. 1991) (finding no abandonment where plaintiff continued to manufacture mechanical and body parts for repair and service after it ceased production of car); Kingsmen v. K-Tel Int'l, Ltd., 557 F.Supp. 178, 183 (S.D.N.Y. 1983) (finding no abandonment where plaintiffs disbanded music group and ceased recording new material because they continued to collect royalties from the sale of previous records and there was no evidence that they did not use the name to promote their previous records).

A finding of trademark use in connection with discontinued goods comports with the Lanham Act's goal to protect the goodwill associated with the mark. Am. Online, 243 F.3d at 821; Defiance Button Mach. Co. v. C&C Metal Prod.s Corp., 759 F.2d 1053, 1059, (2d Cir. 1985). As such, "a company's cessation of business automatically and immediately [does not] terminate its rights to a mark." Defiance Button Mach., 759 F.2d at 1060.

When an owner of a mark announces an intention to cease using the mark, but fails to actually do so, there is no abandonment, "even if [a defendant] did at one time have the goal of discontinuing the ...mark." KeyCorp v. Key Bank & Trust, 99 F.Supp. 2d 814, 827 (N.D. Ohio 2000).

It bears noting that "common law rights in the mark continue unabated' (even if [a] registration is cancelled.)" Far Out Prod.s v. Oskar, 247 F.3d 986, 996 (9th Cir. 2001). "The Lanham Act...does not erode common law rights of a prior user even if the second user registers first." Valcom, Inc. v. Valcom, Inc., 1986 U.S. Dist. LEXIS 19437, at * 10 (E.D. Va. Oct. 61986). Thus, "'the invalidity of a registration, or a subsequent cancellation does not affect trade-mark rights. These [rights] are determined wholly by the principles of common law.'" Car-Freshner Corp. v. Marleen Prod.s Co., 183 F.Supp. 20, 46 (D. Md. 1960) (quoting Callmann, Unfair Competition and Trade-Marks, 2d Ed., Vol. 4, § 97.3(a) pages 2067-2069).

The Court finds that CipherTrust failed to prove abandonment because Cybertrust (or its predecessors) never ceased using the CYBERTRUST mark in commerce on, in connection with, or during the course of, rendering services.

More specifically, in light of the testimony of Cybertrust's witnesses and a review of the exhibits, the Court concludes that Baltimore and Betrusted continued to use, and never ceased using, the CYBERTRUST mark in connection with: (1) the embedment of root keys; (2) the support and maintenance it provided to customers who continued to use version 4.0 of CYBERTRUST CA software; (3) the promotion and sale of the OmniRoot licensing program; and (4) the sale of online SSL certificates. As such, there was no abandonment of rights in the CYBERTRUST mark.

The third parties commonly referenced the CYBERTRUST mark in their marketing and technical literature, which corroborates the Court's determination that Cybertrust (and its predecessors) continued to use the CYBERTRUST mark in commerce, and that Baltimore and Betrusted continued to use, and never ceased using, the CYBERTRUST mark on or in connection with online user certification authority services for others. Cybertrust (or its predecessors) continued to use the CYBERTRUST mark on or in connection with the services described in the '764 Registration. Therefore, the Court concludes that the '764 Registration should not be canceled on grounds of abandonment.

Because CipherTrust failed to plead fraud or seek leave to amend its pleadings to include an allegation of fraud despite knowledge of allegedly fraudulent conduct, a fraud claim is not properly before the Court.  See Lone Star, 43 F.3d at 940 (affirming the district court's denial of defendant's motion for leave to amend the pleadings to "inject the defense of fraud" when the defendant waited until the final day of discovery to assert its fraud claim despite awareness of evidence to support a claim for approximately three months).

Because CipherTrust failed to respond to an argument in Cybertrust's motion for summary judgment papers relating to CipherTrust's unpled fraud claim, CipherTrust conceded the argument.  See High Country Arts and Crafts Guild v. Hartford Fire Ins. Co., 126 F.3d 629, 634-35 (4th Cir. 1997) (holding that when a "[d]efendant move[s] for summary judgement on the grounds that [the] [p]laintiff ha[s] failed [to prove a claim and the] [p]laintiff [does] not address [the] issue in its opposition to the motion for summary judgment...*judgment dismissing [the] cause of action is appropriate*." (citation omitted) (emphasis added)); Witcher v. Brownlee, 2004 U.S. Dist. LEXIS 23246, at *28 (D. Md. Mar. 22, 2004) (finding that plaintiff "abandoned his Count II claim by failing to address the [d]efendant's arguments in his Opposition Memorandum"); Kulik Photography v. Cochran, 975 F.Supp. 812, 814 (E.D. Va. 1997) (finding that on a motion to dismiss,

-49-

plaintiff's failure to address an argument in its opposition required the court to find in favor of defendant on that claim).

Because CipherTrust utterly failed to respond to Cybertrust's summary judgment argument relating to fraud, CipherTrust conceded the argument and fraud is not properly part of this case.

The Lanham Act requires an owner of a federally registered mark to file with the PTO between the fifth and sixth year of registration "an affidavit setting forth those goods or services recited in the registration on or in connection with which the mark is in use in commerce and such number of specimen of facsimiles showing current use of the mark..." 15 U.S.C. § 1058(b). Thus, to obtain renewel of a registration, a registrant must submit: (1) an affidavit stating that the mark is in *use in commerce*; and (2) a specimen showing *current use* in *commerce*. See id. Section 8 does not require a registrant to certify that the specimen submitted has been in use for any particular period of use. Rather, it simply requires that the specimen show current use of the mark in commerce. See id.; N. Light Tech., Inc. v. N. Lights Club, 236 F.3d 57,58 (1st Cir. 2001) (noting that when "plaintiff began its operation of the nothernlight.com website [,it] consequently [began] its use of the 'Northern Light' mark in commerce"). A website printout is an acceptable specimen for a service mark. See In re Milacron Inc., 2001 TTAB LEXIS 43, at *2 (TTAB Jan. 16, 2001).

A party alleging fraud on the PTO must "prove by clear and convincing evidence that [defendants] knowingly made false, material representations of fact and intended to deceive the Patent and Trademark Office." Resorts of Pinehurst, 148 F.3d at 420 (citing Metro Traffic Control, Inc. v. Shadow Network Inc., 104 F.3d 336, 340 (Fed. Cir. 1997); Brittingham, 914 F.2d at 453. "Fraud implies some intentional deceitful practice or act designed to obtain something to which the person practicing such deceit would not otherwise be entitled." First Int'l Serv.s Corp. v. Chuckles, Inc., 1987 TTAB LEXIS 5, at *21 (TTAB Dec. 11, 1987). Thus,

> "[i]f it can't be shown that the statement was a 'false misrepresentation' occasioned by an 'honest' misunderstanding, inadvertence, negligent omission or the like rather than one made with a willful intent to deceive, fraud will not be found. Fraud, moreover, will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true or that the false statement is not material to the issuance or maintenance of the registration."

Id. at 22.

"In matters of fraud in the trademark application context, there is no room for speculation, inference or surmise." Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Dev. Corp., 1997 U.S. Dist. LEXIS 11597, at **11-12 (M.D.N.C. July 10, 1997), rev'd on other grounds, 148 F.3d 417 (4th Cir. 1998) (citation omitted); accord S Indus., Inc. v. Covington Indus., Inc., 2002 TTAB LEXIS 727, at *8 (TTAB Nov. 21, 2002) (stating that "[t]here is no room for

-51-

speculation, inference, or surmise and, obviously, any doubt must be resolved against the charging party" (citation omitted)).

CipherTrust failed to show by clear and convincing evidence that Cybertrust committed fraud on the PTO.  In fact, the evidence at trial shows that no fraud was committed.  Specifically, the Court finds that the Section 8 affidavit Cybertrust submitted to the PTO was truthful and accurate because Cybertrust was using the CYBERTRUST mark on or in connection with the provision of online user CA services for others.  Further, the Court finds that the specimen Cybertrust submitted in support of its Section 8 affidavit showed current use of the CYBERTRUST mark in commerce on or in connection with the services set forth in the '764 Registration.  Accordingly, the Court concludes that CipherTrust failed to prove its fraud claim.

"A trademark cannot be sold or assigned apart from the goodwill it symbolizes." Marshak v. Green, 746 F.2d 927, 929, (2d Cir. 1984); see 15 U.S.C. § 1060.  "Good will is a business value that reflects the basic human propensity to continue doing business with a seller who has offered goods and services that the customer likes and has found adequate to fulfill his needs." 1 McCarthy § 2:17, at 2-3.  A sale of a mark without the accompanying goodwill is called an assignment in gross. 2 McCarthy § 18:3, at 18.

"[T]he purpose of the rule prohibiting the sale or assignment of a trademark in gross is to prevent a consumer from being misled

or confused as to the source and nature of the goods or services that he or she acquires." Sugar Busters LLC v. Brennan, 177 F.3d 258, 265 (5th Cir. 1999); see Pepsico, Inc. v. Grapette Co., 416 F.2d 285, 289 (8th Cir. 1969) (stating "[t]he ultimate concern in all [assignment] cases is the welfare of the public. A case by case treatment of the problem as specific facts present themselves is desirable"); 2 McCarthy § 18:10, at 18-21 (noting that "[t]he situation sought to be avoided in consumer deception resulting from abrupt and radical changes in the nature and quality of the goods and services after assignment of the mark").

This rule against an assignment in gross "is not...intended to be a mechanistic tool for invalidating assignments which do not satisfy a stereo-types set of formalities." Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F.Supp. 1339, 1350 (E.D.N.Y. 1994); 2 McCarthy § 18:3, at 18-9 (stating that "[t]he rules regarding assignment are not purely technical requirements to be considered in the abstract"). Rather, "the rule against assignment of a mark in gross...reflects the need, if consumers are not to be misled from established associations with the mark, that [the mark] continue to be associated with the same or similar products after the assignment." Visa U.S.A., Inc., v. Birmingham Nat'l Trust Bank, 696 F.2d 1371, 1375 (Fed. Cir. 1982) (citation omitted). Accordingly, the rule against assignments in gross focuses on the ultimate result of the assignments rather than the

formalistic business transactions leading to such a result.

The Court concludes that Baltimore and Betrusted had an agreement that Betrusted would purchase the entire PKI business from Baltimore and that did, in fact, occurr. Any separation between the two transactions was de minimis and did not confuse consumers. Baltimore did not assign CYBERTRUST marks to Betrusted without their associated goodwill, and thus there was no invalid assignment in gross.

Judicial estoppel is a "an equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding...." King v. Herbert J. Thomas Mem'l Hosp., 159 F.3d 192, 195 (4th Cir. 1998). The Fourth Circuit applies "judicial estoppel to prevent a party from benefitting itself by maintaining mutually inconsistent positions regarding a particular situation." Id.; see Scott v. Land Span Motor, Inc., 781 F.Supp. 1115, 1119 (D.S.C. 1991) (stating that "[t]he [judicial estoppel] doctrine is applicable regardless of whether the prior position was taken in a judicial or quasi-judicial proceeding"). Indeed, the doctrine prevents a party from "playing fast and loose with the courts, from blowing how and cost as the occasion demands, or from attempting to mislead the [courts] to gain unfair advantage." King, 159 F.3d at 196 (citation omitted).

Judicial estoppel applies when:

(1) the party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding;
(2) the prior inconsistent position must have been accepted by the tribunal; and
(3) the party to be estopped must have been taken inconsistent positions intentionally for the purpose of gaining unfair advantage.

Id.

Judicial estoppel binds CipherTrust to the representations it made to the PTO to secure its trademark registration.  See Petro Stopping Ctr.s, 130 F.3d at 94 (rejecting plaintiff's argument that it is entitled to broad protection of the term "Petro" because "[i]n Petro Stopping's own words [to the PTO], outside of truck stop services its mark is 'entitled to a weak scope of protection'"); see Plus Prod.s v. Natural Organics, Inc., 1984 U.S. Dist. LEXIS 19801, at *7 (S.D.N.Y. Feb. 3, 1984) (noting that after "[d]efendant sought to register NATURE'S PLUS as a trademark[,]...[i]t cannot now argue that the term is merely descriptive").  Those representations persuaded the PTO Examining Attorney to permit the CIPHERTRUST mark to proceed to publication, and CipherTrust cannot now disavow them.  As such, the Court should not consider any testimony or evidence that contradicts the following representations:

(1) "The CIPHERTRUST mark suggests confidence in the integrity of a cryptographic system."  DTX 132 at

CIPHER001552 and CIPHER001555.

(2)   "[C]ustomers for [CipherTrust's] goods...are highly
      sophisticated corporate information technology
      managers....: <u>Id</u>. at CIPHER001554.

(3)   The computer field is "vast and comprised of "disparate
      segments."   <u>Id</u>.

The Court finds that CipherTrust is judicially estopped from
offering any evidence tending to contradict these representations

and finds these representations to be established as facts in the
case.

In evaluating a party's intent in adopting a particular mark,
"'the second comer has a duty to so name...[its] product as to
avoid all likelihood of consumers confusing it with the product of
the first comer.'" <u>Osem Food Indus., Inc.</u>, 917 F.2d at 165 (quoting
<u>AMP, Inc. v. Foy</u>, 540 F.2d at 1187.  As such, "when one adopts a
mark similar to one already in use, there is an affirmative duty to
avoid any likelihood of confusion."  <u>Volkswagenwerk</u>, 814 F.2d at
817.

In light of this Court's finding that Mr. Chaudhry's claim
that he had never heard of CYBERTRUST prior to September 2004
despite being a Senior Vice President of VeriSign in 1998 and 1999
it is not credible, the Court finds that CipherTrust had actual
notice of the CYBERTRUST mark prior to the date on which

-56-

CipherTrust began using its mark.

Federal registration of a trademark confers "constructive notice of the registrant's claim of ownership of the trademark..." to subsequent users. Brittingham, 914 F.2d at 452; see 15 U.S.C. §§ 1057 and 1072; Lone Star, 43 F.3d at 932; Armand's Subway, Inc. v. Doctor's Assoc.s, Inc., 604 F.2d 849, 849 (4th Cir. 1979).

As Cybertrust's two federal registrations for the CYBERTRUST mark issued before CipherTrust decided to register the CIPHERTRUST mark, the Court finds that CipherTrust had constructive notice of Cybertrust's registrations.

Because CipherTrust had actual and constructive notice of Cybertrust's prior rights in the CYBERTRUST mark, it had an affirmative obligation to avoid any likelihood of confusion.

A Seventh Amendment right to a jury trial attaches to cases in which legal, rather than equitable, claims are asserted. Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564-65 (1990). Where the available remedy sought is equitable in nature, there is no constitutional right to a jury trial. Actions for "disgorgement of improper profits" are restitutionary and thus equitable in nature. Id. at 570. Indeed, "in the trademark infringement context, a claim for disgorgement of profits is equitable in nature." G.A. Modefine S.A. v. Burlington Coat

Factory Warehouse Corp., 888 F.Supp. 44, 45 (S.D.N.Y. 1995) (denying jury trial).

There is no inherent right to a jury trial in a claim for trademark infringement and unfair competition. Skippy, Inc. v. CPC Int'l., Inc., 674 F.2d 209, 214 (4th Cir. 1982). A court must look to the remedy sought, not the claim asserted, to determine whether there is a right to a jury trial. Id.

CipherTrust's counsel stated during the June 17, 2005 hearing that he could not offer any evidence of lost sales (or any actual damages), a legal remedy. June 17, 2005 Hearing Trans. at 22. Instead, CipherTrust intended to rely on two theories as "proxies" for actual damages: (1) reasonable royalty: and (2) corrective advertising. However, if these theories are proxies for actual damages, CipherTrust can only recover under them if it can prove that it sustained *some actual harm* from Cybertrust's allegedly infringing conduct. Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 642 (D.C. Cir. 1982) (holding that an award based on damages requires some showing of actual loss). See West & Co. v. Arica Inst., Inc., 1976 U.S. Dist. LEXIS 13350, at *14 (S.D.N.Y. 1976) (declining to make an award for corrective advertising because plaintiff failed to prove it had suffered actual harm); Because CipherTrust conceded that it cannot prove actual damages, the theories of reasonable royalty and corrective advertising (which are actual damage proxies) are not available to it. As such, the

only remedy (other than injunctive relief) available to CipherTrust was for disgorgement of profits, an equitable remedy.

Because the only remedies available to CipherTrust were equitable in nature, CipherTrust was not entitled to a jury trial under Seventh Amendment analysis.


/S/

_____
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE


Alexandria, Virginia
November 28, 2005